IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ALBA ORDOÑEZ ORDOÑEZ,

    Defendant.

CRIMINAL ACTION FILE NO.

1:21-CR-113-SCJ-JKL-1

## FINAL REPORT AND RECOMMENDATION

Defendant Alba Ordoñez Ordoñez is charged in this case with conspiracy to possess with intent to distribute methamphetamine and fentanyl and possession with intent to distribute methamphetamine and fentanyl. [Doc. 47.] In February 2021, agents executed an anticipatory search warrant at Ms. Ordoñez's residence, which resulted in the seizure of fentanyl pills and methamphetamine, among other things. Following the execution of the warrant she was interviewed by law enforcement and made inculpatory statements. The case is presently before the Court on Ms. Ordoñez's motion to suppress statements she made during the custodial interview. [Doc. 52.] She has also moved to suppress evidence obtained during the search, arguing that the warrant was not supported by probable cause,

that it violated the Fourth Amendment's particularity requirement, and that the presence of a private cameraman who videoed part of the events for a National Geographic television program unlawfully expanded the scope of the search. [Docs. 53, 55.]

I held a two-day evidentiary hearing on the motions on April 27 and June 24, 2022. [Doc. 64 (transcript of April 27 hearing); Doc. 75 (transcript of June 24 hearing).] Department of Homeland Security ("HSI") Special Agents ("SA") Thomas Cadwallader and Steven Ledgerwood and HSI Task Force Officers ("TFO") Raul Perez and David Schweizer testified at the hearing. Following the hearing, the parties filed supplemental briefs. [Docs. 80, 82, 83.] For the reasons that follow, it is **RECOMMENDED** that Ms. Ordoñez's motions to suppress evidence be **DENIED IN PART** and **GRANTED IN PART** and motion to suppress statements be **DENIED IN PART** and **GRANTED IN PART**.

## I.    BACKGROUND

On February 22, 2021, SA Cadwallader applied to United States Magistrate Judge Christopher C. Bly for an anticipatory search warrant for a residence located at 5886 Dana Drive NW, Norcross, Georgia. [Doc. 64 at 8.] *See also In re: Search of 5886 Dana Drive NW, Norcross, Georgia 30093*, No. 1:21-mc-405 (search warrant and affidavit).] In support of the application, SA Cadwallader provided an

2

affidavit in which he summarized his relevant training, experience, and education. (Aff. of Thomas Cadwallader ¶¶ 4-15.[1])  To establish probable cause, he relayed the following:  On February 17, 2021, Customs and Border Patrol ("CBP") officers intercepted an internationally-shipped DHL package addressed to a Michell Escalante at the Dana Drive residence with a return address at a location in Morelia, Mexico.  (*Id.* ¶ 19.)  Agents confirmed that the Dana Drive address was an actual address, but there was no information linking it to "Michell Escalante."  (*Id.* ¶ 20.)  The manifest for the package indicated that it contained a "Mirage Brand Cold Weather Heater" originating from Morelia; however, an x-ray of the package revealed abnormalities within a compressor.  (*Id.* ¶ 19.)  CBP officers drilled into the compressor and found a crystalline substance that field-tested positive for methamphetamine.  (*Id.*)  The combined weight of the compressor and the methamphetamine was 6.09 kilograms.  (*Id.*)  The officers did not remove the methamphetamine from the package because doing so would damage the package and jeopardize the investigation.  (*Id.* ¶ 19 n.1.)

---

[1] The affidavit is available at *In re: Search of 5886 Dana Drive NW, Norcross, Georgia 30093*, No. 1:21-mc-405, Dkt. No. 1 at 2-14 (N.D. Ga.).

To identify and arrest the individuals involved with this apparent drug smuggling conspiracy, SA Cadwallader stated in his affidavit that on February 23, 2021, agents would place an electronic tracking device ("ETD") and an electric sensor in the parcel and conduct a controlled delivery to the Dana Drive residence using an undercover law enforcement officer dressed as a DHL delivery person. (Cadwallader Aff. ¶ 22.)  He requested the issuance of a warrant for the Dana Drive residence, with its execution contingent on a specific "triggering event," defined as follows:

> After the successful delivery of the **SUBJECT PARCEL** to the **TARGET LOCATION** and agents' receipt of a signal from the ETD indicating that the **SUBJECT PARCEL** has been opened and is within the **TARGET LOCATION**.

(*Id.* ¶ 23.)  He also requested that the warrant authorize the seizure of evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, and 952, including:

> Any and all evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and 952, in any form, including:
>
> 1.   Any portion or piece of the DHL box and contents of air conditioner with compressor addressed to "Michell ESCALANTE, 5886 Dana Dr. NW, Norcross, GA, 30093"; with a shipper address of "Fernando LOPEZ ROCHA, 60500, Vasco de Quiroga, 28, Morelia, MI 60600, Mexico";
>
> 2.   Methamphetamine and/or other controlled substances;

4

3.   Drug paraphernalia, chemicals, and equipment to make, store, process, or distribute methamphetamine and other drugs, including glassine bags, scales, stamps, cutting agents, binding compounds, and containers;

4.   Any documents related to shipments, orders, possession or transportation of packages of controlled substances or packages;

5.   Any books and records that include the names, addresses, telephone numbers, email addresses of narcotics purchasers or suppliers, which would reveal the identities of confederates and narcotics trafficking locations;

6.  Bulk currency, which may be proceeds of controlled substances sales or possessed for the purpose of purchasing controlled substances;

7.  Financial records, such as bank records, deposit slips, vehicle and property titles and mortgages/leases, including indicia of occupancy or ownership;

8.  Firearms, ammunition, and firearm accessories; and

9.  Cellular phones, tablets, computers, electronic storage devices, Subscriber Identity Module ("SIM") cards, money counters, and chargers associated with the seized device(s).

(*Id.* Ex. B.[2])  On February 22, 2021, Judge Bly signed the warrant.  *In re: Search of 5886 Dana Drive NW, Norcross, Ga. 30093*, No. 1:21-mc-405, Dkt. No. 1 at 15.

The following day, on February 23, 2021, agents conducted the controlled delivery of the parcel.  The details of the delivery and execution of the search

---

[2] The warrant explicitly did not authorize the search of any cell phones, tablets, computers, or SIM cards.  (Cadwallader Aff. Ex. B. n.1.)

warrant are set forth in an affidavit that SA Cadwallader provided in support of the criminal complaint in this case. (*See United States v. Alba Ordoñez Ordoñez and Jose Guadalupe Canizales Rivera*, Case no. 1:21-MJ-189, Doc. 1 ("Compl.").) According to the complaint, at approximately 12:40 p.m., an undercover agent dressed as a DHL employee brought the package to the front door of the Dana Drive residence and knocked on the door. (*Id.* at 11.) While he was waiting for someone to answer the door, a tan Toyota Tacoma truck arrived. (*Id.*) Ms. Ordoñez was driving the truck and codefendant Jose Canizales was in the passenger seat. (*Id.*) Ms. Ordoñez approached the undercover agent and accepted the package. (*Id.*) The agent asked if she was Michell Escalante, and she responded that she was and signed for the package as "Miche Excale." (*Id.*) Ms. Ordoñez instructed the agent to carry the box into the residence and up a flight of stairs to a living room. (*Id.* at 11-12.) Agents later observed Mr. Canizales leave the residence, collect a tool bag from the Tacoma, and reenter the residence. (*Id.* at 12.)

At approximately 1:08 p.m., agents were notified that the sensor in the package had been tripped. (Compl. at 12.) Around five minutes later, agents approached the residence to execute the warrant. [Doc. 64 at 10.] Agents knocked and announced and could see Ms. Ordoñez and Mr. Canizales running back and

forth in the upstairs area.  [*Id.*]  Agents breached the doorway and found Ms. Ordoñez on a top stairway landing.  [*Id.*]  She was taken into custody and brought outside where she was handcuffed.  [*Id.*]  Mr. Canizales, meanwhile, was found hiding in a closet.  [*Id.*]  He was placed under arrest, handcuffed, and also taken outside.  [*Id.* at 11-12]

The agents secured the residence to make sure no one else was hiding that could pose a threat.  [Doc. 64 at 12.]  Once secured, the agents searched the residence.  [*Id.*]  They labeled each room with a letter and took photographs of the rooms in their pre-search condition.  [*Id.*]  SA Cadwallader took photographs of evidence that was found during the search.  [*Id.* at 24.]  Agents found the opened DHL parcel on the upstairs landing and the air conditioner on the floor of the living room.  (Compl. at 13.)  Agents observed the panel of the air conditioner had been taken off and black carpet that surrounded the compressor was removed, but the compressor was still located in its original space within the air conditioning unit. (*Id.*)  Agents also found methamphetamine, fentanyl pills, and a drug ledger.  [Doc. 64 at 11.]

Approximately one hour after the initial entry into the residence, TFO Perez arrived at the scene to help conduct a custodial interview of Ms. Ordoñez, whose

primary language is Spanish.  [Doc. 64. at 14, 16, 52.]  When TFO Perez arrived, SA Cadwallader handed off the photography duty to another agent so he could participate in the interview.  [*Id.* at 24.]  The interview took place inside the residence, around a dining room table.  [*Id.* at 14.]  It lasted for about an hour.  [*Id.* at 55.]  Ms. Ordoñez remained seated throughout the interview.  [*Id.* at 15.]  She was not handcuffed.  [*Id.*]  She did not appear to be under the influence of alcohol or drugs.  [*Id.* at 16.]  SA Cadwallader's and TFO Perez's firearms were holstered the entire time.  [*Id.* at 16, 55.]  At no point during the interview did anyone yell at or threaten Ms. Ordoñez.  [*Id.* at 16-17.]  The interview was audio recorded.  [*Id.* at 17, 57-59; Gov't Ex. 3 (audio recording of interview), Ex. 4 (transcript of interview).]  TFO Perez was the lead questioner because he is fluent in Spanish, however, he also provided some translation for SA Cadwallader, who did not speak Spanish.  [*Id.* at 17, 49.]

TFO Perez advised Ms. Ordoñez of her *Miranda*[3] rights in Spanish, reading from his HSI-issued *Miranda* card.  [*Id.* at 61; Gov't Ex. 2 (Advisement and Waiver of *Miranda* Rights card in English and Spanish).]  As he read the card to her, she acknowledged with head nods and affirmative verbal responses that she understood

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

what he was reading to her.  [Doc. 64 at 62-63.]  Nonetheless, Ms. Ordoñez was nervous during the interview and cried at times.  [*Id.* at 19, 60.]  She did not, however, indicate that she wanted to stop the interview, that she was physically uncomfortable, or that she wanted an attorney.  [*Id.* at 19.]  She also appeared to understand TFO Perez because each time he asked her a question or spoke to her, she responded appropriately.  [*Id.* at 61.]

While the interview was taking place, other agents were gathering up evidence and moving it to the nearby living room for processing by an evidence custodian.  [Doc. 64 at 19-20, 73.]  Also, while the interview was taking place, agents brought a cameraman employed by Lucky 8 TV, LLC into the residence.[4] [Doc. 64 at 104.]  The cameraman was recording footage for a reality television program, "To Catch a Smuggler," for broadcast on the National Geographic Channel.[5]  [*Id.* at 20.]  The agents attempted to gain consent from Ms. Ordoñez for Lucky 8 to film inside the home by asking her to allow them to film a shrine in the

---

[4] Prior to this time, the cameraman had been outside the residence at the street and had not participated in the entry into the residence or the seizure of any evidence.  [Doc. 64 at 101-02.]  Nor did the cameraman assist in any interviews of Ms. Ordoñez or Mr. Canizales.  [*Id.* at 102.]

[5] "To Catch a Smuggler" follows law enforcement entities as they work to seize narcotics.  [Doc. 64 at 21, 89; Doc. 75 at 8.]  HSI and National Geographic were parties to a contract that allowed filming for the show.  [Doc. 78 at 8-9.]

lower level of the residence.  [*Id.* at 67.]  Ms. Ordoñez responded by saying, "Oh, my…oh my little saint…Yes. That's fine."   [*Id.*]   Officers then presented Ms. Ordoñez with a consent form written entirely in English.  (Gov. Ex. 7.)  The top portion of the form included the handwritten phrase, "Meth/Shrine 02/23/21 ATL HSI."  (*Id.*)  Ms. Ordoñez signed the form.  (*Id.*)  TFO Perez did not read the form to Ms. Ordoñez in Spanish.  [*Id.* at 68.]  Officers then guided the cameraman throughout the home, allowing him to film on various levels of the home including close-up shots in the area of the "shrine."  [*Id.* at 105-06, 113.]

Meanwhile, Ms. Ordoñez's interview continued.  About midway through the interview, she and TFO Perez had the following exchange:

| | |
|---|---|
| TFO PEREZ: | Okay.  Okay.  And on the other phone do you have more information? |
| MS. ORDOÑEZ: | No. |
| TFO PEREZ: | Just in this one?  Okay. |
| SA CADWALLADER: | This, this can only help you. |
| TFO PEREZ: | But, this can only help you, because that way we can tell the prosecutor, "hey, she helped us.  She told us where the stuff was and who sent it."  Right?  "They were threatening her family."  Anything. |
| MS. ORDOÑEZ: | No.  It's that. |

| | |
|---|---|
| TFO PEREZ: | Okay, and I already know that you told me that. But then show me who these people are so, we can help you. |
| MS. ORDOÑEZ: | They are in Mexico. They are not here. |
| TFO PEREZ: | Okay. But you have their contact information, right? . . . . Show me who sent you that package. Both packages, the one from over there and the one from here. Show me the number for, for, the one in jail, please. |
| MS. ORDOÑEZ: | It's because. Are you going to take care of me? Please. [SOBS] |
| TFO PEREZ: | Of course we are going to take care of you. |
| MS. ORDOÑEZ: | [SOBS]  I know that I am going to jail. |
| TFO PEREZ: | Okay, but the . . . |
| MS. ORDOÑEZ: | I don't want to go. |
| TFO PEREZ: | It's fine, but we can only help you at this moment. |
| MS. ORDOÑEZ: | I don't want to go to jail. I don't want to leave my kids. |
| TFO PEREZ: | Okay. You have to work with me then. |

(Gov. Ex. 4 at 50-51.)  The interview then continued, during which Ms. Ordoñez

made inculpatory statements.

11

## II.   DISCUSSION

I organize the analysis of Ms. Ordoñez's motion to suppress as follows. First, I take up her arguments that the search of the residence violated the Fourth Amendment because the search warrant lacked probable cause and was not sufficiently particularized.   Second, I address her argument that all the evidence seized from the residence should be suppressed because the cameraman's presence in the residence unconstitutionally expanded the scope of the search in violation of the Fourth Amendment.   Finally, I address her motion to suppress statements.

### A.   Ms. Ordoñez's Challenge to the Anticipatory Warrant

#### 1.   The Parties' Arguments

Ms. Ordoñez presents a two-pronged attack to the search warrant in this case. First, she argues that the warrant was not supported by probable cause and, therefore, all evidence must be suppressed. [Doc. 55 at 5-6.[6]] Second, she argues that the warrant was not sufficiently particularized in violation of the Fourth Amendment. [*Id.* at 6-7.] The government has responded to these arguments. [*See* Doc. 56 at 6-10.]   The government also argues that suppression is not warranted

---

[6] Ms. Ordoñez's perfected motion to suppress evidence is not paginated; thus, I refer to the page numbers automatically generated by CM/ECF.

under the good faith exception to the exclusionary rule. [*Id.* at 11-12.] Ms. Ordoñez has filed a reply. [Doc. 61.] I address each argument in turn.

### 2.      Analysis

### a.      Probable Cause Supported Issuance of the Warrant

A judicial officer considering an application for a search warrant must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he affidavit should establish a connection between the defendant and the [place] to be searched and a link between the [location] and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)). As a result, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference

traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing *Gates*, 462 U.S. at 236-37, and *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

These principles apply to anticipatory search warrants, that is, warrants that become effective on the occurrence of a future event. *See United States v. Grubb*s, 547 U.S. 90, 95 (2006) ("An anticipatory warrant is 'a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place.'") (quoting 2 LaFave, Search & Seizure § 3.7(c)). Such warrants "require the magistrate [judge] to determine (1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will* be on the described premises (3) when the warrant is executed." *Id.* at 96. In other words, the affidavit must show that "*if* the triggering condition occurs there is a fair probability that contraband or evidence of a crime will be found in a particular place," and "there is probable cause to believe the triggering condition *will* occur." *Id.* at 96-97 (citations omitted); *see also United States v. Santa*, 236 F.3d 662, 673 (11th Cir. 2000) ("Affidavits supporting the application for an anticipatory warrant 'must show, not only that the agent believes a delivery of contraband is going to occur, but also how he has obtained this belief, how reliable his sources are, and

what part government agents will play in the delivery.'") (quoting *United States v. Garcia*, 882 F.2d 699, 703 (2d Cir. 1989)).

Applying these principles here, I readily conclude that Judge Bly had a "substantial basis" for concluding that probable cause existed to believe that if the triggering condition occurred—*i.e.* the opening of the package containing hidden methamphetamine—there was a fair probability that contraband or evidence of a crime would be found at the residence and that there was probable cause to believe the triggering condition would, in fact, occur. In the affidavit in support of the application, SA Cadwallader related facts that established the package addressed to "Michell Escalante" contained methamphetamine concealed in an air conditioner compressor; that there was no "Michell Escalante" listed at the delivery address; that SA Cadwallader knew from his training and experience that drug traffickers import illegal narcotics secreted in legitimate cargo, which is then sent via private parcel delivery services to the intended destination; and that the parcel containing the concealed narcotics listed a Mexican shipper address (Cadwallader Aff. ¶ 10, 19, 20, 21.) These facts establish that there was probable cause to believe that methamphetamine was being imported into the United States and headed to a specific address for further distribution as part of a drug trafficking conspiracy. As

15

to the triggering event, SA Cadwallader attested that agents intended to insert an electronic tracking device into the package and that agents would receive a signal once the package was opened and within the residence located at the delivery address.  (*Id.* ¶ 23.)   As a matter of common sense, it was probable that the triggering event would occur—*i.e.,* that the package would be opened after being delivered to the residence.  Finally, probable cause also existed to believe that if the package were opened at the residence, that other contraband and evidence of international drug trafficking would be found at the residence because, once opened, it is reasonable to believe that evidence of drug trafficking will be located there. Further, it is reasonable to believe that if the package containing the contraband is opened within the residence, other evidence of drug trafficking will be found there as well, including documents and things that SA Cadwallader listed in his affidavit that drug traffickers ordinarily keep in their residences or stash houses, including, for example, illegal controlled substances, drug paraphernalia, ledgers, financial records, money, firearms, computers, mobile telephones, and other electronic devices. (*Id.* ¶¶ 10-15.)

Ms. Ordoñez's arguments to the contrary are not persuasive.  She argues that probable cause has not been established because there was no indication that the

recipient of the package would have been aware that it contained narcotics; that there were no additional facts connecting the residence or its occupants to drug trafficking; and that even the affidavit notes that the addressee, Michell Escalante, was not associated with the address.  [Doc. 55 at 6.]  But even though the only connection between the residence or its occupants to drug trafficking activity was the anticipated delivery and opening of the package, the circumstances of how the package was shipped and how methamphetamine was hidden to avoid detection made it highly likely—and certainly probable—that whoever received the package was aware of its contents, that he or she would open it within the residence, and, if that happened, contraband and evidence associated with drug trafficking would be found at the residence.  "The magistrate judge was in a position to determine that one does not send [controlled substances] through the mail to a specific address on a whim."  *United States v. Lawson*, 999 F.2d 985, 988 (6th Cir. 1993).  Also, addressing a package to a fictious name suggests that the persons involved in the transaction did not want the true identity of the recipient of the package to be disclosed—an explanation that is made all the more reasonable by the fact that the package contained a large quantity of narcotics shipped via a commercial parcel delivery service.   Under the deferential standard of review at play, SA

Cadwallader's affidavit was sufficient to establish probable cause to believe that the occupants of the residence would accept the package and open it, knowing that it contained illegally-imported narcotics.[7]  As a result, when the anticipatory search warrant was issued, there was a substantial basis for Judge Bly's findings that there was probable cause to believe that contraband or evidence of criminal activity would be located within the residence if the triggering condition occurred and that the triggering condition—the opening of the package—would occur within the residence.

### b.     The Warrant Was Not Unconstitutionally Overbroad

I next turn to Ms. Ordoñez's argument that the warrant was unconstitutionally overbroad.  The Fourth Amendment requires that a search warrant particularly describe the places to be searched and the things to be seized. U.S. Const. amend. IV.  This so-called particularity requirement prevents general searches and assures the individual whose property is searched and seized of the

---

[7] The government argued that probable cause was also established because Defendant falsely identified herself as Michell Escalante when she accepted the package.  [Doc. 56 at 8.]  Defendant's acceptance of the package is immaterial to the probable cause analysis because she did so after the warrant was issued and, thus, that fact could not have been considered by Judge Bly in determining whether probable cause existed.

lawful authority of the executing officer, his need to search, and the limits of his power to search. *Groh v. Ramirez*, 540 U.S. 551, 561 (2004). A warrant that fails to sufficiently particularize the things to be seized is unconstitutionally overbroad, and evidence seized pursuant to such a warrant is subject to suppression under the exclusionary rule. *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000).

The anticipatory warrant in this case passes constitutional muster. As explained above, SA Cadwallader's affidavit established probable cause to believe that evidence of drug trafficking would be present in the residence and his affidavit identified numerous categories of evidence that, based on his training and experience, are usually involved in drug trafficking. In *United States v. Pineda*, another Judge on this Court explained that

> Courts have found that items related to drug trafficking, such as, controlled substances; equipment and property used to further drug transactions; records relating to drug transactions and the laundering of drug proceeds; photographs and records of co-conspirators or objects of the criminal activity; proceeds, currency, valuables, and assets and records pertaining thereto, as well as to ownership of the location being searched; and firearms, fall within the scope of the probable cause established to search a location for evidence of drug related criminal activity and that such descriptions of the items to be seized are sufficiently particular given the nature of the crimes being investigated.

No. 1:11-CR-00006-CAP-JFK, 2012 WL 2906758, at *7 (N.D. Ga. June 4, 2012) (collecting cases), *report and recommendation adopted*, 2012 WL 2907447 (N.D.

Ga. July 16, 2012).  The same goes for the warrant here.  SA Cadwallader related that multiple kilogram amounts of methamphetamine were being imported into the United States from abroad for delivery at a residence to a fictitious individual, which certainly permits the inference that the residence would contain other evidence associated with drug trafficking, including drug paraphernalia, bulk currency or other forms of proceeds, packaging and shipping materials, ledgers and other records of drug trafficking, firearms, and electronic devices—all of which the warrant authorized agents to seize.[8]

Citing dicta in *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017), Ms. Ordoñez argues that the search warrant was unconstitutional because it authorized a search that was broader than necessary because it permitted the search of the entire residence.  [Doc. 55 at 7-8.]  As she sees it, the limited basis for probable cause scope (namely, the delivery and opening of the package) meant that the warrant should not have extended to the whole house.  [*Id.*]  *Blake*, however, is distinguishable.

_____

[8] To reiterate, the warrant allowed agents to seize electronic devices, but did not authorize the search of any such devices.

In *Blake*, the FBI obtained search warrants for defendant Tara Jo Moore's Facebook account that first required Facebook to provide to the government almost all data associated with her account, and then, second, authorized the government to review the data and seize information that constituted fruits, evidence, and instrumentalities of a specified crime.  868 F.3d at 966-67.  The Eleventh Circuit expressed its concern that this two-stage procedure violated the particularity clause and essentially amounted to "the internet-era version of a 'general warrant.'"  *Id*. at 974.  But the court did not decide whether the warrants in fact violated the Fourth Amendment because the court found that suppression was unjustified under the good-faith exception to the exclusionary rule.  *Id*. at 974-75.

Ms. Ordoñez cites no authority—and the undersigned is not aware of any—that has applied *Blake* to invalidate a search warrant of a residence.  And the undersigned sees no good reason to extend *Blake* to a residence because a suspect's Facebook account is fundamentally different than a home.  In *Blake*, the court's concern about the breadth of the warrant stemmed from the fact that it was not possible for a suspect to hide evidence on a Facebook account.  As a result, when Facebook responded to a warrant it would provide the government with "precisely" the data requested, which for Moore meant that Facebook turned over virtually

21

everything related to her account stored on its servers. *Blake*, 868 F.3d at 974. The court contrasted Facebook's manner of storing and producing data to where the government obtains a warrant to seize a suspect's entire hard drive and then later searches it for evidence, explaining that suspects can hide information on hard drives using "obscure folders, misnamed folders, [or] encrypted data." *Id.* A residence is much more akin to a hard drive because evidence can be concealed within a residence. Indeed, SA Cadwallader's affidavit acknowledges this, stating that he has "observed that drug traffickers commonly secret contraband, proceeds of drug sales, and records of drug transactions in secure locations with their residence and stash houses, for easy access and to conceal such items from law enforcement authorities." (Cadwallader Aff. ¶ 12.) As a result, the undersigned finds that *Blake* does not compel a finding that the warrant in this case violated the particularity requirement of the Fourth Amendment.

But even if the warrant did not satisfy the particularity requirement, the good-faith exception to the exclusionary rule applies here. In *United States v. Leon*, 468 U.S. 897, 920-21 (1984), the Supreme Court recognized the good-faith exception to the exclusionary rule for searches conducted pursuant to warrants. Observing that the purpose of the exclusionary rule is to deter unlawful police

conduct, the Court found that this purpose would not be served, and the exclusionary rule should not be applied, when an officer, acting with objective good faith, has obtained a search warrant from a judge and acted within its scope. *See Leon*, 468 U.S. at 920-21.  Nonetheless, the *Leon* Court noted four situations in which the suppression of evidence would still be appropriate: (1) when the judicial officer issues the warrant on a deliberately or recklessly false affidavit; (2) when the judicial officer wholly abandons his judicial role; (3) when the warrant is issued on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when the warrant is so facially deficient that an officer could not reasonably presume it to be valid. *Id.* at 923.

Here, a reasonable officer would read the description of property to be seized as limited to evidence of drug trafficking located in the residence.  Thus, the officer would not think he or she was executing a general warrant, and any defects in the description of the area to be searched are not so facially obvious that an officer could not reasonably presume it to be valid. *See Leon*, 468 U.S. at 923; *Blake*, 868 F.3d at 974-75 (applying the *Leon* good-faith exception where a warrant for a defendant's social media account authorized the disclosure of "virtually every kind of data that could be found in a social media account" because the warrant was not

so facially deficient that an officer could not have presumed it to be valid). Furthermore, SA Cadwallader's warrant was presented with the assistance of an Assistant United States Attorney and was signed by a United States Magistrate Judge, which would provide an "additional objective reason" for the officer executing the warrant to believe it was valid. *See United States v. Allen*, 625 F.3d 830, 839 (5th Cir. 2010) (applying *Leon* good-faith exception to warrant that broadly authorized the seizure of property "designed or intended for use . . . as the means of committing a criminal offense or that contains evidence of the commission of a criminal offense," based, in part, on the fact that the officer who obtained the warrant had it reviewed by colleagues, submitted it to prosecutors, and presented it to a magistrate judge).

Ms. Ordoñez argues that the *Leon* good faith exception is inapplicable because SA Cadwallader's affidavit was so lacking in indicia of probable cause as to render official belief that probable cause existed entirely unreasonable. [Doc. 61 at 4-5.] She maintains that SA Cadwallader's affidavit "essentially claims that there is probable cause to believe that contraband will be present in the home because law enforcement officers themselves would be delivering such contraband"; thus, it "is conclusory and wholly insufficient to support probable

24

cause for a warrant to search the entire house." [*Id.* at 4.]  Ms. Ordoñez takes too narrow of a view of the facts relayed in the affidavit and the inferences that may reasonably be drawn from them.  To recap, law enforcement knew that a package containing methamphetamine, hidden in an air compressor, had been sent into the United States for delivery to someone who had no connection with the delivery address.  This created probable cause to believe that the package would be opened at the residence and if that happened, there would be a fair probability that contraband or evidence of a crime will be found in the residence.  Thus, even if the warrant were found to be deficient, law enforcement reasonably relied in good faith on the warrant.

In sum, I conclude that the search warrant did not run afoul of the particularity requirement, but that even if it did, the *Leon* good-faith exception to the exclusionary rule applies.  Thus, Ms. Ordoñez's facial challenge to the anticipatory warrant fails.

### B.    The Presence of the Lucky 8 Cameraman

### 1.    The Parties' Arguments

Ms. Ordoñez argues that the presence of the Lucky 8 cameraman at the residence expanded the scope of the search in violation of the Fourth Amendment "by filming and obtaining extensive, high quality footage" of portions of the

home's interior and, thus, all evidence obtained during the search should be suppressed.  [Doc. 80 at 13-18.]  She alternatively asserts that even if wholesale suppression is not warranted, "at a minimum, the footage obtained by the media should be suppressed."  [*Id.* at 18.]

The government responds that the cameraman's presence did not violate the Fourth Amendment because he did not enter the residence until the search was "substantially complete" and he only filmed in the home after Ms. Ordoñez gave consent.  [Doc. 82 at 19.]  The government further argues that even if the cameraman's presence violated the Fourth Amendment, suppression is not appropriate because the media's presence did not lead to the discovery of any new or additional evidence.  [*Id.* at 21-23.]  Finally, the government contends that even if some portion of Lucky 8's film footage should be suppressed, footage taken outside the residence is not subject to suppression because Ms. Ordoñez had no reasonable expectation of privacy in the view of her home that is readily observable from a public street.  [*Id.* at 23-24.]

In reply, Ms. Ordoñez argues that the government's assertion that the search was "substantially complete" makes it clear that the search was not entirely complete; thus, the cameraman was present during the execution of the search in

26

violation of the Fourth Amendment.   [Doc. 83 at 6.]   She also reiterates her contentions that she did not knowingly or voluntarily consent to filming within the residence, and that to the extent she did consent, her consent was limited to the area around her shrine.   [*Id.* at 6-7.]   Last, she argues that suppression is warranted here because Lucky 8 contracted with HSI to provide a television program for television entertainment, rather than news reporters.   [*Id.* at 7-8.]

### 2.    Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. amend. IV.   As noted above, a warrant must "particularly describe[e] the place to be searched, and the person or things to be seized."   *Id.* When a search exceeds the scope of a warrant, "evidence obtained in that search may be excluded."   *United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000).

The starting point for the analysis is the Supreme court's decision in *Wilson v. Layne*, 526 U.S. 602 (1999).   In *Wilson*, the parents of a fugitive brought a *Bivens* action against federal law enforcement officers who invited newspaper reporters into the parents' home during the execution of a search warrant to apprehend their son.   *Wilson*, 526 U.S. at 607.   It was undisputed that the reporters' intrusion was not related to the objectives of the search, that they did not engage in the execution

27

of the warrant, and that they did not assist the officers; rather the reporters "were working on a story for their own purposes . . . as evidenced in part by the fact that the newspaper and not the police retained the photographs" taken inside the suspect's home. *Id*. at 613. The parents argued that the presence of the reporters violated the Fourth Amendment by unconstitutionally expanding the scope of the search. *Id.* at 607. The officers countered that they had qualified immunity because their conduct did not violate the Constitution. The Supreme Court sided with the parents as to the constitutionality of the officers' conduct, holding "it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Id.* at 614. The Court went on to find that the right was not clearly established at the time and, thus, the officers were immune from suit. *Id.* at 617. Critically, because *Wilson* was a civil action, the Court did not address whether, or to what extent, the exclusionary rule applies when law enforcement allow members of the media into a residence in violation of the Fourth Amendment. *See Wilson*, 526 U.S. at 614 n.2 (stating in a footnote that "[w]e have no occasion here to decide whether the exclusionary rule

28

would apply to any evidence discovered or developed by the media representatives").

A year after *Wilson* came down, the Eleventh Circuit applied *Wilson* in the context of a motion to suppress in a criminal case, *United States v. Hendrixson*, under circumstances strikingly similar to the case at bar.  In *Hendrixson*, the police allowed a television reporter to join them during a search of a defendant's residence that yielded over 300 grams of methamphetamine.  234 F.3d at 495.  The defendant moved to suppress on the grounds that the mere presence of the news media violated the Fourth Amendment.  *Id.* at 496.  The district court, applying pre-*Wilson* precedent, denied the motion, finding that allowing the media to access the residence during the search did not constitute a Fourth Amendment violation.  *Id.* On appeal, the Eleventh Circuit found that *Wilson* compelled a finding that the media's presence did violate the Fourth Amendment.  *Id.*  But the Court of Appeals still affirmed the denial of the motion to suppress, declining to apply the exclusionary rule because there was no connection between police misconduct and the seizure of evidence.  *Id.* at 497. The court explained:

> Although the media were present for the search of [the] residence, media presence did not expand the scope of the search (the search actually carried out by the police themselves) beyond that allowed by the terms of the warrant.  There is no allegation that the reporter

29

aided the search; he did not touch, move, or handle anything in the residence. The police thus conducted a search within the parameters of the warrant, and the evidence obtained during the search is not subject to the exclusionary rule.

*Id.*

Applying these precedents here, the Court must first determine whether the cameraman's presence within the house violated the Fourth Amendment. The government makes two main arguments that his presence did not: (1) he did not enter the home until the agents had "substantially completed" the search, and (2) the cameraman only filmed inside the house after Ms. Ordoñez had given consent. [Doc. 82 at 19-21.]

The first assertion misses the mark. In determining whether a Fourth Amendment violation has occurred, the undersigned sees no meaningful difference between a search that is, as the government puts it, "substantially completed" and one that is not. Neither *Wilson* nor *Hendrixson* recognized such a distinction; rather, those decisions focused on whether the media's presence inside a residence was authorized by the warrant. True, when the cameraman entered the home, the agents were processing what they had seized, indicating that there was no more evidence remaining in the house to seize. But the fact remains that agents' presence in the residence was still authorized by the search warrant, and, thus, the cameraman's

entry into the residence (absent some exception to the Fourth Amendment warrant requirement such as consent) expanded the scope of the search warrant in violation of the Fourth Amendment.

Whether the search was "substantially complete" bears instead on the extent to which suppression is warranted. If a search is substantially complete, then it seems more likely that the presence of unauthorized persons did not lead to the discovery of any evidence. Here, like the reporter in *Hendrixson*, the Lucky 8 cameraman did not "aid[] the search; he did not touch, move, or handle anything in the residence." *Hendrixson*, 234 F.3d at 497. Indeed, Ms. Ordoñez points to no evidence that was seized as a result of the cameraman's presence in the house, as all the evidence had been gathered and was simply being inventoried by the time he entered the house. Absent a connection between the cameraman's presence and the seizure of evidence, there is nothing to suppress. *See United States v. Novick*, No. CRIM07-455 JNE/SRN, 2008 WL 2788023, at *4 (D. Minn. July 15, 2008) (stating that "this Court agrees with those that have reasoned that exclusion is not warranted where such violations of the Fourth Amendment are unrelated to the seizure of evidence—that is, where the seizure would have occurred even absent such violations") (citing *Hendrixson*, 234 F.3d at 496). As a result, even if the

31

cameraman's presence inside the residence violated the Fourth Amendment, evidence that the agents obtained during the search is not subject to the exclusionary rule.[9]

The issue of Ms. Ordoñez's consent presents a thornier issue. The parties seem to agree that the footage the cameraman recorded could be subject to suppression if the cameraman's presence violated the Fourth Amendment. The government contends that Ms. Ordoñez consented to allow the cameraman to record inside the residence; Ms. Ordoñez contends that she did not provide knowing and voluntary consent to the filming. On this record, the undersigned is constrained to find that the cameraman's presence inside the residence exceeded the scope of the warrant, so the issue is whether, or to what extent, Ms. Ordoñez consented to allow filming.

_____

[9] In reply, Ms. Ordoñez attempts to distinguish *Wilson*, *Hendrixson*, and *Novik* on the grounds that those cases involved news reporters, in contrast to here where the cameraman was filming a "commercial program for entertainment purposes." [Doc. 83 at 7.] The sole authority that Ms. Ordoñez cites, *Berger v. Hanlon*, 129 F.3d 505 (9th Cir. 1997), simply analyzed whether the media's involvement in a search violated the Fourth Amendment; it did not address the distinct issue of whether suppression was an appropriate remedy. As a result, the undersigned finds that the fact the cameraman in this case was recording footage for a National Geographic program is a distinction without a difference.

Where the government relies on the consent exception to the warrant requirement, the government has the burden of showing that such consent was voluntary. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (holding that a prosecutor who relies on consent to justify a search must show that such consent was freely and voluntarily given). Factors relevant to assessing the voluntariness of consent include whether the police used coercive procedures, the extent of the consenter's cooperation with the officers, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).

Here, Ms. Ordoñez provided verbal consent to allow the cameraman to record the area of her "shrine." (Gov't Ex. 4 at 12-13.[10]) Specifically, TFO Perez

---

[10] The translated portion of the interview reads as follows:

| | |
|---|---|
| TFO PEREZ: | There is a room here, to the left. |
| MS. ORDOÑEZ: | No, I was going to rent that one out to a man. |
| TFO PEREZ: | You were going to rent it out? |
| MS. ORDOÑEZ: | But he, he never came back. |
| TFO PEREZ: | Okay. Do you allow for a camera to record that? What, what was there in the room. |
| MS. ORDOÑEZ: | What was in there? |

told Ms. Ordoñez that SA Ledgerwood said that he only wanted to film the "downstairs" where there was an "altar." (*Id.* at 12.) Ms. Ordoñez responded, "Oh, my . . . my little saint." (*Id.*) TFO Perez asked, "Your little saint? Is that fine?" (*Id.*) She replied, "Yes, that's fine." (*Id.* at 13.) Ms. Ordoñez contends that the agents coerced her into agreeing because they did not say who would film within the home and TFO Perez initially implied that law enforcement needed to conduct the filming. [Doc. 83 at 6 (citing Gov't Ex. 4 at 12).] But viewing the circumstances in totality, the undersigned does not believe that she was misled into thinking that law enforcement had to record inside the house. Critically, only

---

| TFO PEREZ: | I don't know, yet. We have to record it. Is that fine? . . . Is it fine, Alba? |
| MS. ORDOÑEZ: | Yes, it's fine. |
| . . . . | |
| MS. ORDOÑEZ: | In which room? |
| TFO PEREZ: | Um . . . |
| SA LEDGERWOOD: | [IN ENGLISH] Just that I want of film downstairs, the . . . the shrine. |
| TFO PEREZ: | Oh, he says that only downstairs where you have the, the . . . he says there's an altar. |
| MS. ORDOÑEZ: | Oh, my . . . oh my little saint. |
| TFO PEREZ: | Your little saint? Is that fine? |
| MS. ORDOÑEZ: | Yes, that's fine. |

34

moments after assenting to the recording of the shrine area of the house, she declined to consent to being recorded.  (Gov't Ex. 4 at 14-15.)  This shows that she understood that she could refuse consent.

But the scope of her consent is a different matter.  Verbally, Ms. Ordoñez consented to allow the recording of the shrine area.  The government contends that her consent extended to the entire residence because the "Location Release Form" she signed permitted the cameraman to record throughout the house.  (*See* Ex. 7.) The problem for the government, however, is that this form is in English and no one attempted to translate it for her before she signed it.  Aside from pointing to the signed release, the government—which bears the burden of proof—offers no argument that her consent was knowing or voluntary.  For these reasons, it is recommended that Ms. Ordoñez's motion to suppress be granted as to footage of areas inside the residence other than the shrine.[11]  Otherwise, the motion should be denied.

----

[11] The government's contention that footage of the residence taken from the public street should not be suppressed is well-taken, as Ms. Ordoñez has not shown that she had a reasonable expectation for privacy as to images of the exterior of the house that the public could readily observe.

C.      **Motion to Suppress Statements**

1.      **The Parties' Arguments**

Ms. Ordoñez argues that her statement was involuntary because SA Cadwallader and TFO Perez misrepresented the law by telling her that making a statement could "only help" her.  [Doc. 80 at 5 (citing Gov't Ex. 4 at 50).]  In support, she principally relies on *United States v. Lall*, where the Court of Appeals held that a suspect's noncustodial statement to law enforcement was involuntary because the detective told the suspect that "any information that [the suspect] shared with the police would not be used to prosecute him."  [*Id.*]  She also argues that officers induced her to speak by "repeatedly" telling her "that if she talked to them, they would 'help' and 'take care' of her and her family."  [*Id.* at 8-9.]  She asserts that officers implied that if she provided helpful information, she could avoid being arrested, going to jail, and being separated from her children.  [*Id.* at 9-10.]  She further points out that she was distraught and sobbing throughout the interview, including when TFO Perez made these statements to her.  [*Id.* at 10-11.]  In addition, she contends that none of the officers took steps to ensure she was not under the influence of alcohol or other substances, even though there was an open, half-drunk beer on the dining room table and drugs were found within the residence.  [*Id.* at 11.]  Finally, she argues that because all her statements were obtained as a

36

direct result of the illegal search of her home, they must be suppressed.  [*Id.* at 12-13.]

The government responds that Ms. Ordoñez's waiver of *Miranda* was knowing, voluntary and intelligent given the complete lack of coercive conduct and her verbal acknowledgment of her *Miranda* rights.  [Doc. 82 at 9-10.]  The government further argues that the agents' statements did not render the interview involuntary because they did not promise confidentiality or make promises to induce her to make statements.  [*Id.* at 11-14.]  The government also argues that there is no evidence that she was intoxicated or of unsound mind at any point during the encounter.  [*Id.* at 15-18.]

On reply, Ms. Ordoñez argues that she is not complaining that the agents promised confidentiality, but rather that they incorrectly promised her that her statements could only help her.  [Doc. 83 at 2.]

> ### 2.   Analysis
>
> #### a.   Ms. Ordoñez's Statements Were Not Fruit of the Poisonous Tree

I first take up Ms. Ordoñez's contention that her statements must be suppressed as fruit of the poisonous tree because the search of her residence was unconstitutional.  As discussed above, the warrant was supported by probable cause

and did not violate the particularity requirement of the Fourth Amendment.  Nor is there any connection between the presence of the Lucky 8 cameraman and Ms. Ordoñez's statements.  Accordingly, her statements were not obtained as a result of an illegal search of her home.

### b.    Ms. Ordoñez's *Miranda* Waiver Was Valid

Next is the validity of Ms. Ordoñez's *Miranda* waiver.  In *Miranda v. Arizona*, the Supreme Court created a presumption that statements elicited during a custodial interrogation are coerced, and, thus, not admissible at trial, unless a suspect is first advised of certain constitutional rights, namely, "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479.[12]  "The government has the burden of showing the knowing and intelligent nature of a waiver."  *United States v. Farley*, 607 F.3d 1294, 1326 (11th Cir. 2010).  This inquiry has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must

---

[12] The parties do not dispute that Ms. Ordoñez was subjected to a custodial interrogation for purposes of *Miranda*.

> have been made with a full awareness of both the nature of the right
> being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Accordingly, when the government seeks to admit a defendant's inculpatory statement at trial, the government must prove by a preponderance of the evidence that, in making the statement, the defendant knowingly and voluntarily waived her *Miranda* rights.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."  *Moran*, 475 U.S. at 421 (quotation omitted).  The totality of all the surrounding circumstances includes "both the characteristics of the accused and the details of the interrogation."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

Here, the first prong—whether Ms. Ordoñez's decision to speak was the product of a free and deliberate choice rather than intimidation, coercion, or deception—is satisfied.  The physical setting in which the interrogation took place was not unduly coercive:  Ms. Ordoñez was seated at her dining room table with TFO Perez and SA Cadwallader; both had their firearms holstered; and she was not handcuffed.  Nor were their interactions coercive:  they did not raise their voices at her or threaten her.  TFO Perez advised her of her rights in Spanish by reading from

a pre-printed, standard-issue, advice-of-rights card that touched all of the bases required by *Miranda*.  Ms. Ordoñez indicated that she understood with head nods and by agreeing to talk with TFO Perez and SA Cadwallader. [Doc. 64 at 18, 64-64.]

The government has also satisfied the second prong—that Ms. Ordoñez had a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421.  TFO Perez read Ms. Ordoñez her *Miranda* rights in Spanish following the waiver-of-rights card, and Ms. Ordoñez, who appeared to understand TFO Perez, indicated she understood his rights.

Ms. Ordoñez's attempts to sow doubts as to her mental capacity are not persuasive.  First, her statements during the interview that her "Santa Muerta" told her in a dream the previous Sunday "to not receive anything" is not an indication that she lacked the mental wherewithal to waive her rights or understand what was occurring.  (Gov't Ex. 4 at 73.)  Given the circumstances, it is far more reasonable to interpret her statements as an indication that she is a spiritual or superstitious person and that she regretted having participated in the events leading up to the search and arrest.  Likewise, her assertion that the agents did not "take any steps to

ensure that she was not under the influence of any substances" falls flat. [Doc. 80 at 11.] Although there was an open half-consumed bottle of beer on the dining room table and narcotics were recovered from the residence, SA Cadwallader testified that based on his training and experience, Ms. Ordoñez did not appear to be under the influence. [Doc. 64 at 16, 66.] Indeed, there is no evidence that Ms. Ordoñez had drunk any beer or used any of the substances found in the house. In addition, earlier in the interview she refused to consent to the filming of her face, which further indicates that she was aware of what was happening and possessed the mental capacity to make important decisions, despite being in an emotional state.

For these reasons, the undersigned finds that the government has met its burden to prove by a preponderance of the evidence that Ms. Ordoñez voluntarily, knowingly, and intelligently waived her *Miranda* rights.

### c. A Portion of Ms. Ordoñez's Post-*Miranda* Statements Should Be Suppressed

The inquiry does not, however end there. Even if government satisfies its burden of showing a valid *Miranda* waiver, the government still must establish that the ensuing statements themselves were voluntary. *See United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) ("Determining the admissibility of a postarrest

confession requires a two-part inquiry.   We first decide whether the law enforcement officers complied with the requirements of *Miranda v. Arizona*; if so, we then determine if the confession was voluntary.") (citations omitted); *see also United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements. Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness.").  "Once an individual receives his *Miranda* rights, statements made thereafter by law enforcement in connection therewith which are clearly incompatible with the intent of *Miranda* and its progeny will be considered involuntary." *United States v. Harris*, 72 F. Supp. 3d 1332, 1337 M.D. Ga. 2014) (citing *Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884, 894 (11th Cir. 2003)). "Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver." *United States v. Byrd*, No. 1:16-CR-315-TWT-AJB, 2017 WL 3821696, at \*5 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted*, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017).

The undersigned agrees with Ms. Ordoñez's argument that investigators' comments midway through her interrogation that her statement could "only help" contradicted the prior *Miranda* warnings and rendered her subsequent statement

42

inadmissible.   Generally, a waiver is not knowing and intelligent where the *Miranda* rights are contradicted by an interrogating officer.   *See Hart*, 323 F.3d at 893-95; *United States v. Beale*, 921 F.2d 1412, 1434-35 (11th Cir. 1991).   In *Beale*, the defendant signed a waiver of his *Miranda* rights after an agent told him that "signing the form would not hurt him."   921 F.2d at 1434.   The Court of Appeals found the district court erred in admitting the defendant's statement made after that advisement because such an advisement "contradicted the *Miranda* warning" and misled the defendant "concerning the consequences of relinquishing his right to remain silent."   *Id.* at 1435.   In *Hart*, a detective told the defendant that "honesty wouldn't hurt him" before the defendant gave a full confession.   323 F.3d at 889. Notably, the detective made that comment several minutes after a different detective "went to great lengths to apprise [the defendant] of his rights . . . including that anything he said could be used against him in court" and the defendant signed a waiver form.   *Id.* at 893-94.   The Court of Appeals determined that the defendant's statement had to be suppressed because his waiver was "the product of deception and was not made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."   *Id.* at 893 (quotation marks omitted).

43

The case that Ms. Ordoñez cites in her briefs, *Lall*, similarly determined that a detective's comments can render a confession involuntary even after properly administered *Miranda* warnings.  In *Lall*, the defendant was Mirandized before an initial interrogation, but then later a detective told him on two separate occasions that authorities were not going to pursue charges against him, leading to a confession.  607 F.3d at 1281-82.  The Court of Appeals determined that the detective's statements rendered the confession involuntary and undermined the prophylactic effect of the previously administered *Miranda* warnings.  *Id.* at 1287.

Here, as in *Hart* and *Lall*, Ms. Ordoñez was fully apprised of her *Miranda* rights at the beginning of the interview, but later comments rendered some of her statement involuntary.  Simply put, telling Ms. Ordoñez that "this can only help you" directly contradicted the *Miranda* warning and is "not compatible with the phrase 'anything you say can be used against you in court.'"  *See Hart*, 323 F.3d at 894.  As in *Beale* and *Hart*, the investigators' advice undermined the very right that the *Miranda* warnings seek to safeguard—the right against self-incrimination.

Examining the totality of the circumstances, the Court cannot conclude that, after the investigators' comments midway through the interview, Ms. Ordoñez's decision to keep speaking with police was voluntary, knowing, and intelligent.

Specifically, Ms. Ordoñez appeared to stop being forthright with investigators, they then told her that her statement "can only help" her, she followed up by asking if the investigators would "take care" of her, and TFO Perez reiterated that they could "only help" her "at this moment."  (Gov. Ex. 4 at 50-51.)  The transcript also indicates that Ms. Ordoñez was sobbing during this exchange. (*Id.*)  Ms. Ordoñez's emotional state certainly does not negate an otherwise-valid waiver of *Miranda* rights, contrary to Ms. Ordoñez's argument.  But her emotional state, along with the additional comments from law enforcement, do go to the totality of the circumstances and support a conclusion that the exchange was inappropriate.  In sum, Ms. Ordoñez's statement *after* the investigators' comments that "this can only help you" was not voluntary and, accordingly, must be suppressed.

    In sum, I recommend that Ms. Ordoñez's motion to suppress be granted only as to statements she made after she was told "this can only help you" (*i.e.,* at page 50 of the transcript of the interview), but denied as to her statements prior to then.

## III.   CONCLUSION

    For the foregoing reasons, it is **RECOMMENDED** that Ms. Ordoñez's motions to suppress evidence [Docs. 53, 55] be **DENIED IN PART** and **GRANTED IN PART** and that her motion to suppress statements [Doc. 52] be **DENIED IN PART** and **GRANTED IN PART**.

I have now addressed all referred pretrial matters relating to Ms. Ordoñez and have not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL.**

IT IS SO RECOMMENDED this 24th day of October, 2022.

_____
JOHN K. LARKINS III
United States Magistrate Judge