## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| | **CRIMINAL CASE** |
| **v.** | |
| | **No. 1:-21-CR-113-SCJ** |
| **ALBA ORDOÑEZ ORDOÑEZ** | |

## <u>ORDER</u>

This matter appears before the Court on U.S. Magistrate Judge John L. Larkins III's Report and Recommendation (R&R) (Doc. No. [84])[1], to which Ms. Ordoñez filed objections (Doc. No. [86]). The Court now rules on this Motion.

## I.    BACKGROUND

There were no objections made the Magistrate's factual findings; accordingly, the Court adopts the Magistrate's background section in full.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

On February 22, 2021, SA Cadwallader applied to United States Magistrate Judge Christopher C. Bly for an anticipatory search warrant for a residence located at 5886 Dana Drive NW, Norcross, Georgia (the "Search Location") (Doc. No. [64], 8). See also In re: Search of 5886 Dana Drive NW, Norcross, Georgia 30093, No. 1:21-mc-405 (search warrant and affidavit). In support of the application, SA Cadwallader provided an affidavit in which he summarized his relevant training, experience, and education. (Doc. No. [94-1], ¶¶ 4-15.1) To establish probable cause, he relayed the following: On February 17, 2021, Customs and Border Patrol ("CBP") officers intercepted an internationally-shipped DHL package addressed to a Michell Escalante at the Dana Drive residence with a return address at a location in Morelia, Mexico. Id. ¶ 19. Agents confirmed that the Dana Drive address was an actual address, but there was no information linking it to "Michell Escalante." Id. ¶ 20.The manifest for the package indicated that it contained a "Mirage Brand Cold Weather Heater" originating from Morelia; however, an x-ray of the package revealed abnormalities within a compressor. Id. ¶ 19. CBP officers drilled into the compressor and found a crystalline substance that field-tested positive for methamphetamine. Id. The combined weight of the compressor and the

2

methamphetamine was 6.09 kilograms. Id. The officers did not remove the methamphetamine from the package because doing so would damage the package and jeopardize the investigation. Id. ¶ 19 n.1.

To identify and arrest the individuals involved with this apparent drug smuggling conspiracy, SA Cadwallader stated in his affidavit that on February 23, 2021, agents would place an electronic tracking device ("ETD") and an electric sensor in the parcel and conduct a controlled delivery to the Dana Drive residence using an undercover law enforcement officer dressed as a DHL delivery person. Doc. No. [94-1], ¶ 22. He requested the issuance of a warrant for the Dana Drive residence, with its execution contingent on a specific "triggering event," defined as follows:

> After the successful delivery of the **SUBJECT PARCEL** to the **TARGET LOCATION** and agents' receipt of a signal from the ETD indicating that the **SUBJECT PARCEL** has been opened and is within the **TARGET LOCATION**.

Id. ¶ 23. He also requested that the warrant authorize the seizure of evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, and 952, including:

> Any and all evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and 952, in any form, including:

1. Any portion or piece of the DHL box and contents of air conditioner with compressor addressed to "Michell ESCALANTE, 5886 Dana Dr. NW, Norcross, GA, 30093"; with a shipper address of "Fernando LOPEZ ROCHA, 60500, Vasco de Quiroga, 28, Morelia, MI 60600, Mexico";

2. Methamphetamine and/or other controlled substances;

3. Drug paraphernalia, chemicals, and equipment to make, store, process, or distribute methamphetamine and other drugs, including glassine bags, scales, stamps, cutting agents, binding compounds, and containers;

4. Any documents related to shipments, orders, possession or transportation of packages of controlled substances or packages;

5. Any books and records that include the names, addresses, telephone numbers, email addresses of narcotics purchasers or suppliers, which would reveal the identities of confederates and narcotics trafficking locations;

6. 6. Bulk currency, which may be proceeds of controlled substances sales or possessed for the purpose of purchasing controlled substances;

7. Financial records, such as bank records, deposit slips, vehicle and property titles and mortgages/leases, including indicia of occupancy or ownership;

8. Firearms, ammunition, and firearm accessories; and

4

9. Cellular phones, tablets, computers, electronic storage devices, Subscriber Identity Module ("SIM") cards, money counters, and chargers associated with the seized device(s).

Id. Ex. B.[2] On February 22, 2021, Judge Bly signed the warrant. Doc. No. [94].

The following day, on February 23, 2021, agents conducted the controlled delivery of the parcel. The details of the delivery and execution of the search warrant are set forth in an affidavit that SA Cadwallader provided in support of the criminal complaint in this case. (See United States v. Alba Ordoñez Ordoñez and Jose Guadalupe Canizales Rivera, Case no. 1:21-MJ-189, Doc. No. [1]. According to the complaint, at approximately 12:40 p.m., an undercover agent dressed as a DHL employee brought the package to the front door of the Dana Drive residence and knocked on the door. Id. at 11. While he was waiting for someone to answer the door, a tan Toyota Tacoma truck arrived. Id. Ms. Ordoñez was driving the truck and codefendant Jose Canizales was in the passenger seat. Id. Ms. Ordoñez approached the undercover agent and accepted the package. Id. The agent asked if she was Michell Escalante, and she responded that she was

---

[2] The warrant explicitly did not authorize the search of any cell phones, tablets, computers, or SIM cards. Doc. No. [94-1], 20 n.1.

and signed for the package as "Miche Excale." Id. Ms. Ordoñez instructed the agent to carry the box into the residence and up a flight of stairs to a living room. Id. at 11-12. Agents later observed Mr. Canizales leave the residence, collect a tool bag from the Tacoma, and reenter the residence. Id. at 12.

At approximately 1:08 p.m., agents were notified that the sensor in the package had been tripped. Doc. No. [1], 12. Around five minutes later, agents approached the residence to execute the warrant. Doc. No. [64], 10. Agents knocked and announced and could see Ms. Ordoñez and Mr. Canizales running back and forth in the upstairs area. Id. Agents breached the doorway and found Ms. Ordoñez on a top stairway landing. Id. She was taken into custody and brought outside where she was handcuffed. Id. Mr. Canizales, meanwhile, was found hiding in a closet. Id. He was placed under arrest, handcuffed, and also taken outside. Id. at 11-12

The agents secured the residence to make sure no one else was hiding that could pose a threat. Doc. No. [64], 12. Once secured, the agents searched the residence. Id. They labeled each room with a letter and took photographs of the rooms in their pre-search condition. Id. SA Cadwallader took photographs of evidence that was found during the search. Id. at 24. Agents found the opened

6

DHL parcel on the upstairs landing and the air conditioner on the floor of the living room. (Compl. at 13.) Agents observed the panel of the air conditioner had been taken off and black carpet that surrounded the compressor was removed, but the compressor was still located in its original space within the air conditioning unit. (Id.) Agents also found methamphetamine, fentanyl pills, and a drug ledger. Doc. No. [64], 11.

Approximately one hour after the initial entry into the residence, TFO Perez arrived at the scene to help conduct a custodial interview of Ms. Ordoñez, whose primary language is Spanish. Doc. No. [64], 14, 16, 52. When TFO Perez arrived, SA Cadwallader handed off the photography duty to another agent so he could participate in the interview. Id. at 24. The interview took place inside the residence, around a dining room table. Id. at 14. It lasted for about an hour. Id. at 55. Ms. Ordoñez remained seated throughout the interview. Id. at 15. She was not handcuffed. Id. She did not appear to be under the influence of alcohol or drugs. Id. at 16. SA Cadwallader's and TFO Perez's firearms were holstered the entire time. Id. at 16, 55. At no point during the interview did anyone yell at or threaten Ms. Ordoñez. Id. at 16-17. The interview was audio recorded. Id. at 17, 57-59; Doc. Nos. [71-3]; [71-4]

(transcript of interview).   TFO Perez was the lead questioner because he is fluent in Spanish, however, he also provided some translation for SA Cadwallader, who did not speak Spanish.  Id. at 17, 49.

TFO Perez advised Ms. Ordoñez of her *Miranda* [3] rights in Spanish, reading from his HSI-issued *Miranda* card.  Id. at 61; Doc. No. [71-2]. As he read the card to her, she acknowledged with head nods and affirmative verbal responses that she understood what he was reading to her. Doc. No. [64], 62-63.  Nonetheless, Ms. Ordoñez was nervous during the interview and cried at times. Id. at 19, 60. She did not, however, indicate that she wanted to stop the interview, that she was physically uncomfortable, or that she wanted an attorney.  Id. at 19.  She also appeared to understand TFO Perez because each time he asked her a question or spoke to her, she responded appropriately. Id. at 61.

While the interview was taking place, other agents were gathering up evidence and moving it to the nearby living room for processing by an evidence custodian. Doc. No. [64], 19-20, 73. Also, while the interview was

_____

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

8

taking place, agents brought a cameraman employed by Lucky 8 TV, LLC into the residence.[4] Doc. No. [64], 104. The cameraman was recording footage for a reality television program, "To Catch a Smuggler," for broadcast on the National Geographic Channel.[5] Id. at 20. The agents attempted to gain consent from Ms. Ordoñez for Lucky 8 to film inside the home by asking her to allow them to film a shrine in the lower level of the residence. Id. at 67. Ms. Ordoñez responded by saying, "Oh, my…oh my little saint…Yes. That's fine." Id. Officers then presented Ms. Ordoñez with a consent form written entirely in English. Doc. No. [71-7]. The top portion of the form included the handwritten phrase, "Meth/Shrine 02/23/21 ATL HSI." Id. Ms. Ordoñez signed the form. Id. TFO Perez did not read the form to Ms. Ordoñez in Spanish. Id. at 68. Officers then guided the cameraman throughout the home, allowing him to

---

[4] Prior to this time, the cameraman had been outside the residence at the street and had not participated in the entry into the residence or the seizure of any evidence. Doc. No. [64], 101-02. Nor did the cameraman assist in any interviews of Ms. Ordoñez or Mr. Canizales. Id. at 102.

[5] "To Catch a Smuggler" follows law enforcement entities as they work to seize narcotics. Doc. Nos. [64], 21, 89; 75, 8. HSI and National Geographic were parties to a contract that allowed filming for the show. Doc. No. [78], 8-9.

film on various levels of the home including close-up shots in the area of the

"shrine."   Id. at 105-06, 113.

Meanwhile, Ms. Ordoñez's interview continued.  About midway through

the interview, she and TFO Perez had the following exchange:

| | |
|---|---|
| TFO PEREZ: | Okay. Okay. And on the other phone do you have more information? |
| MS. ORDOÑEZ: | No. |
| TFO PEREZ: | Just in this one? Okay. |
| SA CADWALLADER: | This, this can only help you. |
| TFO PEREZ: | But, this can only help you, because that way we can tell the prosecutor, "hey, she helped us. She told us where the stuff was and who sent it."  Right? "They were threatening her family." Anything. |
| MS. ORDOÑEZ: | No. It's that. |
| TFO PEREZ: | Okay, and I already know that you told me that. But then show me who these people are so, we can help you. |
| MS. ORDOÑEZ: | They are in Mexico. They are not here. |

10

TFO PEREZ:          Okay. But you have their contact information, right? . . . . Show me who sent you that package. Both packages, the one from over there and the one from here. Show me the number for, for, the one in jail, please.

MS. ORDOÑEZ:     It's because. Are you going to take care of me? Please. [SOBS]

TFO PEREZ:          Of course we are going to take care of you.

MS. ORDOÑEZ:     [SOBS]  I know that I am going to jail.

TFO PEREZ:          Okay, but the . . .

MS. ORDOÑEZ:     I don't want to go.

TFO PEREZ:          It's fine, but we can only help you at this moment.

MS. ORDOÑEZ:     I don't want to go to jail. I don't want to leave my kids.

TFO PEREZ:          Okay. You have to work with me then.

(Doc. No. [71-4], 50-51.) The interview then continued, during which

Ms. Ordoñez made inculpatory statements.

## II.   LEGAL STANDARD

Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a de novo review of those portions of the R&R to which Defendant has timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); United States v. Raddatz, 447 U.S. 667 (1980). The district judge must "read the transcript of the hearing before a magistrate on a motion to suppress, before adopting the magistrate's recommendation." United States v. Elsoffer, 644 F.2d 357, 358 (5th Cir. 1981) (per curiam).[6]

For a party's objections to warrant de novo review, she "must clearly advise the district court and pinpoint the specific findings that [she] disagrees with." United States v. Schultz, 565 F.3d 1353, 1360 (11th Cir. 2009). The Eleventh Circuit has noted that "[p]arties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988). The remainder of the

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

R&R, to which neither party offers specific objections, will be assessed for clear error only. See Tauber v. Barnhart, 438 F.Supp.2d 1366, 1373 (N.D. Ga. 2006) ("[I]ssues upon which no specific objections are raised do not so require de novo review; the district court may therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard.") (quoting 28 U.S.C. § 636(b)(1)).

## III.   ANALYSIS

The R&R is due to be granted. Ms. Ordoñez makes three objections. First, the Magistrate erred when it found that the anticipatory warrant was supported by probable cause; second, the anticipatory warrant was not unconstitutionally overbroad; finally, the good faith exception did apply. The Court disagrees

### A.   <u>Probable Cause</u>

The Court finds that the anticipatory warrant was supported by probable cause. "An anticipatory warrant is a 'warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specific place." United States v. Grubbs, 547 U.S. 90, (2006) (quoting 2.W. LaFave, Search and Seizure § 3.7(c), p.398) (4th ed. 2004)). "They require the magistrate to determine (1) that it is *now probable* that (2)

contraband, evidence of a crime, or a fugitive will be on the described premise (3) when the warrant was executed." Id. at 96. "It must be true not only that *if* the triggering condition occurs 'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' but also that there is probable cause to believe the triggering condition will occur." Id. at 96–97 (citing Illinois v. Gates, 462 U.S. 213, 214 (1983)).

"The task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." United States v. Bushay, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing Massachusetts v. Upton, 466 U.S. 727, 728 (1984)). The reviewing court "should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir.1994); see also United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring reviewer to afford "great deference to

judicial determination of probable cause to issue a search warrant")
(citing United States v. Gonzalez, 940 F.2d 1368, 1419 (1996)).

The Court finds that the anticipatory warrant was supported by probable cause. The affidavit shows that Border Control X-rayed a package that was addressed to the Search Location, and the x-ray revealed anomalies in the compressor. Doc. No. [94-1], ¶ 19. The agents then drilled into the compressor, revealing a crystalline substance that tested positive for methamphetamine. Id. The agents then placed an electronic sensor on the package that would alert when the package was opened. Id. ¶¶ 22–23. An uncover agent would act as a DHL delivery person and deliver the package to the Search Location. Id. ¶ 22. The warrant would not become valid until the package was opened at the Search Location. Id. ¶ 23–24.

The Court finds sufficient evidence of probable cause that a controlled substance would be at the Search Location when the search warrant was executed. From the time the controlled substance was identified, the package was under the control of a government agent. Id. ¶¶ 19, 22. A government agent would personally deliver the package to the Search Location. Id. ¶ 22–23. The package contained a specific sensor that would only be triggered when the

package was opened. Id. Accordingly, the Court finds that the attachment of the sensor to the package, the package remaining in the officer's control until its delivery, and the delivery occurring at the Search Location created sufficient probable cause that a controlled substance was at the Search Location when the warrant was executed.

The Supreme Court upheld the validity of a similar warrant. In Grubbs, the Supreme Court found that an anticipatory warrant was valid because there was sufficient probable cause. Grubbs, 547 U.S. at 97.

> In this case, the occurrence, of the triggering condition— successful delivery of the videotape to Grubbs' residence—would plainly establish probable cause for the search. In addition, the affidavit established probable cause to believe the triggering condition would be satisfied. Although it is possible that Grubbs could have refused delivery of the videotape he had ordered, that was unlikely. The Magistrate therefore "had a substantial basis for concluding that probable cause existed."

Id. (citing Gates, 462 U.S. at 238–39) (cleaned up). Here, the existence of probable cause was greater than in Grubbs. In Grubbs, the search warrant was triggered as soon as the individual accepted the package and took it into the residence. Id. at 94. In the case *sub judice*, the search warrant was not triggered until the recipient physically opened the package. Unlike in Grubbs, the recipient could

16

not refuse the delivery before the warrant became effective because the warrant required the package to be accepted, brought into the house, and opened. Accordingly, the Court finds that if the affidavit supporting the Grubbs anticipatory warrant was sufficient to establish probable cause, so too was the affidavit supporting the anticipatory warrant in the case *sub judice*.

Ms. Ordoñez argued that probable cause was lacking because the affidavit did not state facts showing that (1) the recipient of the package was aware that the package contained a controlled substance, (2) the residence or it is occupants were connected to drug trafficking, (3) that the addressee was connected to the residence, or (4) Ms. Ordoñez was involved. Doc. No. [55], 6. Ms. Ordoñez's arguments seem more appropriate as a challenge to the sufficiency of an arrest warrant rather than a search warrant.

An arrest warrant requires that "if the complaint or one or more affidavits filed with the complaint establish probable cause to believe that an offense has been committed and that the defendant committed it, the judge must issue an arrest warrant to an officer authorized to execute it." Fed. R. Crim. P. 4(a). An anticipatory search warrant, however, requires "(1) probable cause that (2) contraband, evidence of a crime, or a fugitive will be on the describe premises,

17

(3) when the warrant is executed." <u>Grubbs</u>, 547 U.S. at 96. An arrest warrant requires the agent to specifically name the defendant and establish probable cause that the named defendant committed a crime, whereas an anticipatory search warrant requires the agent to show probable cause that a controlled substance is located at the premise. <u>Compare</u> Fed. R. Crim. 4(a), <u>with</u> <u>Grubbs</u>, 547 U.S. at 96. Ms. Ordoñez argues that probable cause was lacking because there is nothing to tie a crime to the named defendant; however, the warrant in question is a search warrant, not an arrest warrant. Because the anticipatory warrant does establish probable cause for the existence of contraband at the location, the Court finds that the anticipatory warrant was supported by probable cause. Accordingly, the Court adopts the Magistrate's finding of probable cause.

### B.   <u>Overbreadth</u>

The Court finds that the warrant was not overly broad. "'In order for a search to be reasonable, the warrant must be specific. Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.'" <u>United States v. Maali</u>, 346 F.Supp.2d 1226, 1239 (M.D. Fla. 2004)

(quoting In re Grand Jury Subpoenas Dated December 10, 1987, 926 F.2d 847, 856–57 (9th Cir. 1991)). In this case, Ms. Ordoñez is only challenging the breadth of the warrant. "'The scope of the warrant, and the search, is limited by the extent of probable cause . . . . Probable cause must exist to seize all items of a particular type described in the warrant' and 'thus, the concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant.'" Id. (citation omitted); see also United States v. Smith, 424 F.3d 992, 1004 (9th Cir.2005) ("The purpose of the breadth requirement is to limit the scope of the warrant 'by the probable cause on which the warrant is based.'") (citation omitted). The breadth requirement, therefore, prevents "'general, exploratory rummaging in a person's belongings.'" Smith, 424 F.3d at 1004 (citation omitted).

Ms. Ordoñez argues that the warrant was overly broad because it authorized the officers to search Ms. Ordoñez's entire home, even though the probable cause was solely based on the delivery of a package suspected to contain methamphetamine. Doc. No. [55], 7. Ms. Ordoñez argued that the Eleventh Circuit's opinion in United States v. Blake, 868 F.3d 960, 974 (11th Cir. 2017) made clear that a search warrant of this kind was overly broad. Doc. No.

[55], 7. In *dicta*, the Eleventh Circuit opined that the search warrant concerning Facebook data may have been overly broad because it was not limited to the time that the criminal activity was allegedly occurring or to messages related to the criminal activities. Id. at 974.

Unlike in <u>Blake</u>, the particularized items in the warrant are connected to potential drug trafficking. See <u>Prather</u>, 279 F. App'x at 766 (although the warrants "were broad with respect to their inclusion of all drug-related items," due to the nature of the investigation, drug trafficking linked to the residence, the court found "the scope of the warrants appropriately matched the scope of the police suspicion"); <u>United States v. Harris</u>, 903 F.2d 770, 775 (10th Cir. 1990) ("The type of criminal activity under investigation in the present case—a drug dealing business—makes it difficult to list with any greater particularity the books and records desired to be seized which evidences such activity.").

> Courts have found that items related to drug trafficking, such as, controlled substances; equipment and property used to further drug transactions; records relating to drug transactions and the laundering of drug proceeds; photographs and records of co-conspirators or objects of the criminal activity; proceeds, currency, valuables, and assets and records pertaining thereto, as well as to ownership of the location being searched; and firearms, fall within the scope of the probable cause established to search a location for evidence of drug related criminal

> activity and that such descriptions of the items to be seized are sufficiently particular given the nature of the crimes being investigated.

United States v. Pineda, 2012 WL 2906758, at * 7 (N.D. Ga. June 4, 2012). The particularized items in the warrant are essentially the same as the items contemplated in Pineda. As stated above, the evidence in the affidavit supporting the warrant was sufficient to establish probable cause of drug trafficking. The Court finds that the particularized item in the warrant are those related to the crime of drug trafficking. Accordingly, the Court finds that the particularized items were not constitutionally overly broad.

The Court also finds that the warrant was not overly broad solely because it gave the officers the ability to search the entire home. "Where a warrant has been issued, 'a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992). See also United States v. Phillips, 323 F. App'x 778, 781 (11th Cir. 2009) (finding search warrant allowing officers to search the entire residence was not overly broad; even though, the child pornography was only found in the basement closet,

21

because Defendant exclusively lived at the residence and the pictures and equipment related to them easily are moved within a residence); United States v. Smith, 918 F.2d 1501, 1508–09 (11th Cir. 1990) (finding warrant not overly broad and rejecting claim that agents could not search entire premises, including adjacent house, even though small amount of cocaine was sold at pool and could have been concealed on the person of a third-party seller who was merely present at the transaction); U.S. v. Latimore, No. 1:13-cr-287-TCB, 2014 WL 3109183, at *37–38 (N.D. Ga. July 7, 2014) (holding that search warrant, which permitted the officers to search the entire residence for marijuana, was not overly broad because the search warrant contained probable cause that the defendant engaged in marijuana trafficking); United States v. Harbison, No. 2:10cr140–WKW, 2011 WL 6182112, at *5 (M.D. Ala. Nov. 18, 2011) ("Once the officers had a valid search warrant to search the residence, they were not limited to searching only the area around which they had seen cocaine. While the scope of the search is constrained by reasonableness, it was reasonable to believe that illegal substances would be found in other areas in the residence . . . . Consequently, the search did not exceed the scope of the warrant, nor did it violate the Fourth Amendment's prohibition

on unreasonable searches.") (citing <u>Martinez</u>, <u>id.</u>) (R & R), <u>adopted by</u> 2011 WL 6182404 (N.D. Ala. Dec. 12, 2011).

As the Court stated above, the affidavit contained sufficient evidence to support probable cause to search the house for evidence of drug trafficking. Ms. Ordoñez objects to the area the officers were able to search. <u>See</u> Doc. No. [55], 7 ("In order to search for the particularized items to be seized, agents essentially rummaged through all of Ms. Ordoñez's belongings throughout her entire home in the exact manner the Fourth Amendment was meant to avoid."). Because the Eleventh Circuit found that once a search warrant is validly supported by probable cause, agents can search the entire home, <u>Martinez</u>, 949 F.2d at 1120, the Court finds that the agents' search of Ms. Ordoñez's entire home did not make the search warrant unconstitutionally broad. Accordingly, the Court adopts the Magistrate's finding that the warrant was not unconstitutionally broad.

### C.   <u>Good Faith Exception</u>

The Court finds that even if the warrant was overly broad, the evidence obtained from the search warrant need not be excluded under the good faith exception to the exclusionary rule. <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984), stands for the principle that courts generally should not render inadmissible

evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause. The <u>Leon</u> good faith exception applies in all but four limited sets of circumstances. <u>Id.</u> at 923. The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" <u>Lo–Ji Sales, Inc. v. New York</u>, 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." <u>Id.</u> (internal quotation marks omitted).

Ms. Ordoñez seems to argue that the good faith exception does not apply because the affidavit supporting the warrant lacked any indicia of probable cause to render official belief in its existence entirely unreasonable. Doc. No. [61], 3–4.

Specifically, Ms. Ordoñez argues that the warrant was based on bare-bones and conclusory allegations that the package contained a controlled substance, where the "probable cause to believe that contraband will be present in the home because law enforcement officers themselves would be delivering such contraband." Id. at 4. The Court finds that Ms. Ordoñez misinterprets the probable cause in the affidavit.

The affidavit contains the following allegations. First, Customs and Border Protection Officers intercepted a package with a specific DHL tracking number addressed to the Search Location. Doc. No. [94-1], ¶ 19. The officers then x-rayed the package. Id. The x-ray showed that there were anomalies inside the compressor. Id. The officers drilled the compressor, which revealed a crystalline substance that field-tested positive for the presence of methamphetamines. Id. Special Agent Cadwallader requested to place a sensor on this package on a specific date. Id. ¶ 22. Special Agent Cadwallader proposed that an agent, acting undercover, would deliver the package to the Search Location. Id. The Court finds that these facts are not bare-bones conclusory allegations. The affidavit showed that there was, in fact, methamphetamine that was being shipped to the Search Location. The search warrant did not become effective until after the

package was inside the location and opened. Id. ¶ 23. The Supreme Court found probable cause was present when a recipient accepted a package that contained child pornography and brought the package into the home. Grubbs, 547 U.S. at 97. Accordingly, the Court finds that the successful delivery of the package containing methamphetamine supplied probable cause to believe that drug trafficking was occurring at the Search Location.

Because the Court finds that there was probable cause to support the warrant, the Court finds that the good faith exception to the exclusionary rule would apply in this case. Meaning, the evidence obtained from the execution of the search warrant is not excluded. Accordingly, the Court adopts the Magistrate's findings with regard to the good faith exception.

### D.   Remainder of the R&R

No objections have been filed concerning the remainder of the R&R. Having reviewed those portions of the R&R for clear error, the Court finds that the Magistrate did not clearly err, and those portions are due to be adopted.

## IV.   CONCLUSION

For the foregoing reasons, the Court **ADOPTS** the Report and Recommendation (Doc. No. [84]). Ms. Ordoñez's Motion to Suppress Evidence

26

(Doc. Nos. [53], [55]) is **GRANTED IN PART AND DENIED IN PART**. The footage of the areas inside the residence, other than the shrine, is suppressed. The Court **DENIES** the remainder of Ms. Ordoñez's motion to suppress evidence (Doc. Nos. [53], 55).

Additionally, Ms. Ordoñez's Motion to Suppress Statements is **GRANTED IN PART AND DENIED IN PART**. The Court suppresses all statements made after TFO Perez stated, "this can only help you" on page 50 of the transcript (Doc. No. [71-5], 50. All prior statements are not suppressed.

IT IS SO ORDERED this ___14th___ day of February, 2023.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE